**Thomas BAGNELL, Plaintiff,**

**v.**

**KOMATSU DRESSER COMPANY, et al., Defendants.**

**No. 91 C 6831.**

United States District Court, N.D. Illinois, E.D.

Nov. 30, 1993.

Supplementing Opinion Dec. 15, 1993.

Claudia Oney, Chicago, IL, for plaintiff.

Robert J. Mignin, Richard B. Lapp, Chicago, IL, for defendants.

*MEMORANDUM OPINION AND ORDER*

SHADUR, Senior District Judge.

Thomas Bagnell ("Bagnell") has filed suit against Komatsu Dresser Company ("Komatsu Dresser"), Komatsu America Corporation ("Komatsu America"), Dresser Construction Machinery,[1] David Grzelak ("Grzelak") and Jon Middleton ("Middleton"), alleging:

1. discrimination on the basis of his national origin (Bagnell's origin is here in the United States, and he contends that he was discriminated against because he is not of Japanese origin), a claim that arises under Title VII of the Civil Rights Act of 1964 (42 U.S.C. §§ 2000e to 2000e–17); and

2. breach of contract because defendants did not honor the obligation manifested in Komatsu Dresser's employee handbook to discharge employees only for good cause.

All viable defendants (see n. 1) have joined in a motion for summary judgment on both claims.[2] For the reasons discussed in detail in this opinion, their motion is granted.

*Summary Judgment Standards*

Rule 56(c) requires that to be "entitled to a judgment as a matter of law," the moving party must establish the lack of any "genuine issue as to any material fact" (*Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986)). In that respect a "genuine issue" requires that there be sufficient evidence for a jury to return a verdict in favor of the nonmoving party (*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986)), while a "material fact" is one that "might affect the outcome of the suit under the governing law"—here Title VII (*id.* 477 U.S. at 248, 106 S.Ct. at 2510; *Pritchard v. Rainfair, Inc.,* 945 F.2d 185, 191 (7th Cir.1991)).

In the application of those principles this Court need not draw "every conceivable inference from the record—only those inferences that are reasonable" in favor of nonmovant Bagnell (*Bank Leumi Le-Israel, B.M. v. Lee,* 928 F.2d 232, 236 (7th Cir. 1991)). While the standard for summary judgment is "applied with added rigor in employment discrimination cases, where intent is inevitably the central issue" (*McCoy v. WGN Continental Broadcasting Co.,* 957 F.2d 368, 370–71 (7th Cir.1992)), that does not render the summary judgment procedure

1. Defendants say that to their knowledge no such entity exists. Bagnell has offered nothing to the contrary.

2. This District Court has supplemented Rule 56 with its own General Rule ("GR") 12 to facilitate the resolution of motions for summary judgment. This opinion will cite to the parties' submissions in this fashion:

1. defendants': "D. 12(m) ¶—";

2. Bagnell's: "P. 12(n) ¶—" (this includes both his GR 12(n)(1) response to D. 12(m) and his added factual statement under GR 12(n)(2), because Bagnell's counsel has sensibly numbered the two sets of paragraphs consecutively to avoid confusion); and

3. deposition testimony: "[Name] Dep.—.

"*per se* improper" (*Washington v. Lake County,* 969 F.2d 250, 254 (7th Cir.1992)). Instead summary judgment for defendants is appropriate if the record reveals that no reasonable jury could conclude that Bagnell was fired from his job because of his national origin (*Shager v. Upjohn Co.,* 913 F.2d 398, 399 (7th Cir.1990)).

*Facts*

Before he was terminated on August 5, 1991, Bagnell was employed by Komatsu Dresser as Regional Manager of its North Region, a position that he'd held since approximately February of that year.[3] Bagnell had originally been hired by Komatsu America in October 1987, but he became an employee of Komatsu Dresser after that new entity was formed in September 1988 when Dresser Financial Corporation joined forces with Komatsu America and Komatsu America Manufacturing Corporation (both wholly-owned subsidiaries of Komatsu Limited, a Japanese firm) in a joint venture. Before serving Komatsu Dresser's North Region, Bagnell had been assigned in the same capacity in various other Regions while Komatsu Dresser consolidated marketing operations and reduced the number of Regional Managers from eight to four and then to three.

Bagnell's job involved selling heavy construction equipment such as bulldozers, excavators, road graders, dump trucks and mining equipment, a task that kept him on the road almost constantly. During his visits to various distributors Bagnell was supposed to entertain those customers and to keep records of the expenses incurred, so that he could be reimbursed by Komatsu Dresser. Grzelak, the Vice-President of Sales and Bagnell's immediate supervisor, then reviewed his reports—along with those of the other two Regional Managers, Jenkins Davis ("Davis") and Steve Day ("Day")—to approve and sign them if Grzelak believed them accurate.

In mid-July 1991 one of Bagnell's expense reports prompted Grzelak to direct Carl Prose ("Prose") to conduct an investigation. Grzelak told Prose that there seemed to be differences between Bagnell's reports and those of the other two Regional Managers. More specifically, Prose testified that Grzelak drew attention to the fact that in his opinion Bagnell seemed to have reported more group meals and had submitted more receipts that had been rounded off, including one that looked as if it had an erasure (Prose Dep. I 16–18, 22; Prose Dep. II 7, 11). Because Prose (who was ordinarily charged with the duty of investigation) was about to leave for a vacation, he turned responsibility over to his subordinate Gerald Lovell ("Lovell"), a man who had acquired experience in that sort of auditing at his prior job with International Harvester.

Lovell decided (apparently unilaterally) that the scope of his investigation should include the expense reports of Davis and Day as well. On July 30 Lovell completed his work and drafted two memos, one describing the discrepancies in Bagnell's accounts and another detailing problems he found in the course of examining Davis' and Day's. Bagnell admits that Lovell did not tell Grzelak about the less serious discrepancies that he had found as to Davis' and Day's expense accounts (P. 12(n) ¶ 105).

Lovell's memo in response to Grzelak's request (D.App. Ex. 13) concluded that Bagnell's records raised serious problems. In particular Lovell documented eight questionable practices, including:

- Receipt number 010565 for $95.00 from Marriott's Windows, Columbus, Ohio, was reported by Mr. Bagnell on July 13, 1991.... The Marriott faxed a copy of receipt 010565 which is for two breakfast buffets at a cost of $14.70.
- Receipt number 30614 for $65.00 from Cafe on the Promenade was reported by Mr. Bagnell on June 17, 1991.... The Ramada faxed a copy of receipt 30614 which is for breakfast at a cost of $9.35 on June 19th. In summary, he utilized the receipt twice; (1) on June 17 as entertainment for $65.00 and (2) on June 19 as breakfast for $9.35.
- Receipt number 24480 for $40.00 from Mansfield Host Hotel was reported by Mr.

3. All dates referred to hereafter without year designations are also 1991 dates.

Bagnell on May 11, 1991.... The Mansfield hotel faxed a copy of receipt 24480 which is for a breakfast buffet at a cost of $12.55.

• On May 10, 1991, Mr. Bagnell reported two business meals at Ninety Nines Restaurant. One meal for $25.50 was reported on cash receipt number 19599. One meal for $50.02 was reported on a charge receipt 0195996.... I discussed these receipts with Craig at Ninety Nines Restaurant. He stated that receipt numbers 19599 and 0195996 were the same receipt. The "6" is a special code for the waitress.

Among Lovell's other listed concerns were instances where service establishment identifications had been torn off, dates had been altered and a $91.59 charge had been reported for drinks at a golf outing that Grzelak (who was in attendance) did not recollect Bagnell purchasing.

Within a few days after receiving Lovell's memo (on August 2) Grzelak called a meeting with Bagnell and Komatsu Dresser's Director of Human Resources Middleton to discuss the discrepancies. Bagnell admitted to making alterations in that some of the receipts were not an accurate reflection of the actual expenses, but he insisted that all of the money he claimed could be accounted for by legitimate business purposes (P. 12(n) ¶ 110). Grzelak and Middleton were unpersuaded by what Bagnell had to say in his defense, and he was swiftly terminated on August 5 on the stated ground that he had violated Komatsu Dresser's policy proscribing falsification of expense accounts.[4]

Several months before Bagnell's problems arose (sometime in early 1991) Komatsu Dresser's President Masahiro Sakane ("Sakane") had informed Grzelak that Ichiro (Ivan) Kimijima ("Kimijima") was arriving from Japan, where he had been working as Deputy General Manager of Sales for the parent company. Upon his arrival in April Kimijima assumed the position of Komatsu Dresser's Marketing Support Director. Then after Bagnell was fired Kimijima was selected to succeed him, and Kimijima's old job was turned over to Marius Favret.

*Title VII Claim*

To stave off summary judgment on his Title VII claim, Bagnell must either:

1. create a reasonable inference via direct evidence that anti-American animus motivated Komatsu Dresser to replace Bagnell or

2. absent such direct evidence, create a like reasonable inference via the familiar ping-pong approach dictated by *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–04, 93 S.Ct. 1817, 1824–25, 36 L.Ed.2d 668 (1973) as rearticulated in *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 252–53, 101 S.Ct. 1089, 1093–94, 67 L.Ed.2d 207 (1981).[5]

In the latter respect *St. Mary's Honor Center v. Hicks,* — U.S. —, —, 113 S.Ct. 2742, 2749, 125 L.Ed.2d 407 (1993) has recently reconfirmed that if in the last step of the ping-pong approach the employee does show that the employer's proffered reasons are mere pretext, the trier of fact is permitted "to infer the ultimate fact of intentional discrimination," though such an inference is not compelled because the "ultimate burden

4. Bagnell also says (P. 12(n) ¶¶ 126–38) that after he was fired Komatsu Dresser began a series of investigations, beginning in September 1991, into the expense account reporting of a large number of its employees—including not only Day and Davis but also 11 others (two of those were its people of Japanese origin at comparable reporting levels, Kimijima and Yasukawa (both referred to later in this opinion)). Although those other employees have been implicated in varying degrees of wrongdoing ranging from harmless mistakes upward, none of them has been terminated to date. There is no suggestion, however, that their discrepancies were of a nature or of a level even approaching Bagnell's.

5. It is awkward to continue to repeat Bagnell's burden on the current motion in terms of his merely having to create reasonable inferences—though that is of course accurate, the awkwardness is created by the fact that so much of the case law (not necessarily written in the summary judgment context) speaks of what the employee must "prove" or must "show." Accordingly, whenever this opinion does employ either of those "prove" or "show" locutions it should be understood in terms of Bagnell's lesser burden of having to create reasonable inferences, not actually having to bear the burden of persuasion. That inference-creating burden is the test that this Court has used throughout.

of persuasion" remains with the employee at all times.[6]

█ As for the level of proof required to defeat Komatsu Dresser's motion, Bagnell Mem. 4 asserts that "Bagnell prevails when he offers any, [sic] 'proof which casts doubt upon the veracity of the employer's stated reason for its action'" (quoting *Stumph v. Thomas & Skinner, Inc.,* 770 F.2d 93, 98 (7th Cir.1985)). To be blunt, that is dead wrong—it is a lesser variant of the error that the Supreme Court later corrected in *St. Mary's Honor Center.* As this Court had earlier explained in *Conley v. University of Chicago Hosp.,* 1991 WL 264603, *5, 1991 U.S.Dist. LEXIS 17836, at *14 (N.D.Ill.):

> In a sense, then, *Stumph*'s broad brush statement must be read in light of the direct evidence (though thin) suggesting a discriminatory mindset that was in the record there. For the Seventh Circuit cases essentially hold not that a plaintiff can survive summary judgment merely by casting a shred of doubt on the employer's stated reasons, but rather that the plaintiff must offer some nugget of proof adequate to suggest that a reasonable jury could find discrimination proven by a preponderance of the evidence.

That "nugget of proof" must consist of more than mere "naked assertions"—rather some specific record evidence must tend to establish intentional discrimination (*Powers v. Dole,* 782 F.2d 689, 694 (7th Cir.1986)).

In this instance Bagnell does not contend that he has offered up anything that can be described accurately as *direct* evidence of national-origin discrimination. Instead his claim is based on the indirect method, the first component of which is normally the establishment of a prima facie case—a task that *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093 describes as "not onerous." As *Pilditch v. Board of Educ. of City of Chicago,* 3 F.3d 1113, 1117 (7th Cir.1993) has put it:

> [T]he initial elements of an indirect evidence prima facie case are relatively simple to prove, and are designed to see that the plaintiff can get beyond summary judgment even though direct evidence is absent.

In the most frequently encountered type of case asserting national-origin discrimination, one advanced by someone of foreign origin, the plaintiff must show that (1) he or she was of such origin, (2) the level of his or her work conformed to the employer's legitimate expectations, (3) he or she was discharged despite that satisfactory job performance and (4) the employer sought a replacement for him or her (*Young In Hong v. Children's Memorial Hosp.,* 993 F.2d 1257, 1261 (7th Cir.1993)). But as for reverse discrimination cases (those brought by persons whose origin is in the United States), although such claims are certainly cognizable (*McDonald v. Sante Fe Trail Transp. Co.,* 427 U.S. 273, 279–80, 96 S.Ct. 2574, 2578–79, 49 L.Ed.2d 493 (1976)) our Court of Appeals has yet to decide whether the *McDonnell Douglas–Burdine* framework applies in that context (*Pilditch,* 3 F.3d at 1116 n. 1). Hence the exact contour of the prima facie case in such reverse discrimination cases remains an unsettled question (*id.; Kirk v. Board of Educ. of Bremen Community High Sch. Dist. No. 228,* 811 F.2d 347, 354 n. 10 (7th Cir.1987)).

That open issue need give no pause in the resolution of this case, however. *Pilditch,* 3 F.3d at 1117–18 n. 1 has explained that the formulation of an appropriate prima facie test can be bypassed entirely in this type of case:

> [T]he *McDonnell Douglas* framework drops out of the picture after the plaintiff has established a prima facie case of discrimination and the employer has put forth a non-discriminatory reason for his action (as was done here). At that point, after the *McDonnell Douglas* framework has served its purpose, the question is simply whether the plaintiff can prove that the employer acted because of an illegitimate motive. We have concluded for the reasons below that Pilditch cannot, and this result would be the same whether or not

6. There is of course an important exception in the "mixed-motives" situation dealt with in *Price Waterhouse v. Hopkins,* 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989). More on this subject later.

McDonnell Douglas applies to this reverse discrimination claim.

Because the later discussion shows that Bagnell is wholly unable to create a reasonable inference that defendants' motives were illegitimate or pretextual, his Title VII claim can be dispatched without the need to resolve the question that remains open in the reverse discrimination context.

Hence it is appropriate first to recapitulate briefly Komatsu Dresser's stated reason for firing Bagnell: the numerous falsifications in his expense account reporting. In that respect Grzelak relied on Lovell's memo detailing eight instances of reporting inaccuracies of varying levels of seriousness: instances of padded expenses (such as a receipt altered to reflect an amount more than six times the actual charge), other facial alterations of receipts regarding dates and locations, a double submission of the same receipt as though two separate charges were involved, and a $91.59 report of questionable drink expenses at a golf outing.[7]

Bagnell objects vigorously to the characterization of those peccadillos as fraudulent. Instead he sets out a claimed explanation for each allegation, and he takes strong issue with Komatsu Dresser's failure to take additional steps to corroborate the charges "externally" (P.Mem 12–13; P. 12(n) ¶ 24). Before this opinion turns to examine the subject of pretext vel non, it should be emphasized that the critical factor is what the employer *believed* the situation to be—as exemplified by the statement in *Bechold v. IGW Systems, Inc.*, 817 F.2d 1282, 1285 (7th Cir.1987), quoting *Dorsch v. L.B. Foster Co.*, 782 F.2d 1421, 1426 (7th Cir.1986):

> It is enough if the decision was "genuinely and honestly made in an attempt to select the employees to be retained on the basis of performance related considerations."

No court is in a position to substitute its own conclusion for the good faith business judgment of the employer—see, e.g., *Smith v. General Scanning, Inc.*, 876 F.2d 1315, 1321 (7th Cir.1989) (citations omitted):

> At any rate, it is not our purpose to second-guess an employer's good faith business decision. As we frequently have stated: we do "not sit as a super-personnel department that reexamines an entity's business decisions." "No matter how medieval a firm's practices, no matter how high-handed its managers, [Title VII does] not interfere." Rather, our inquiry is limited to "whether the employer gave an honest explanation of its behavior."

In those terms Komatsu Dresser's proffered reason for termination readily clears this rather trivial hurdle. Expense account inaccuracies of the type here at issue surely qualify as a legitimate good faith reason why an employer would terminate an employee—our Court of Appeals held in *McCarthy v. Kemper Life Ins. Cos.*, 924 F.2d 683, 688 (7th Cir.1991) that such "repeated occasions" of expense account fraud uncovered by an investigation specifically meet that test.

█ And so the analysis leads in all events to the question whether Bagnell can create the reasonable inference that Komatsu Dresser's stated reliance on his cheating was a pretext—a bogus cover story for Komatsu Dresser's real purpose of getting rid of him because of his national origin. *Burdine*, 450 U.S. at 256, 101 S.Ct. at 1095 teaches that the proof of pretext can take two forms:

> either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.

That dichotomy has often been recast as the need to show that the firing would not have taken place "but for" the illegal discriminatory motive (see, e.g., *Dale v. Chicago Tribune Co.*, 797 F.2d 458, 464 (7th Cir.1986)). And

7. What has just been outlined in the text illustrates a situation often presented in employment discrimination cases: one in which the first and third steps of the conventional *McDonnell Douglas–Burdine* formulation may effectively telescope into one. Where such repeated expense account cheating is established, an employee faces the same difficulty in demonstrating that he or she is meeting the employer's "legitimate expectations" (an essential ingredient of the prima facie hurdle that must be overcome at the first step) as in demonstrating that the employer's stated reliance on such misconduct is pretextual (the employee's burden at the third step). Again that supports the *Pilditch* focus on the last question alone.

the indirect branch of the *Burdine* formulation[8] has frequently been framed in this Circuit as allowing the requisite lack of credence to be shown in any one of three ways (*Mechnig v. Sears, Roebuck & Co.*, 864 F.2d 1359, 1364–65 (7th Cir.1988)):

> (1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate his discharge, *or* (3) that they were insufficient to motivate discharge.

*Mechnig*'s first and third methods of proving pretext offer no comfort whatever to Bagnell. Grzelak's belief that Bagnell had committed expense account fraud was well-founded, given the documentation and Bagnell's admissions (cf. *Dale*, 797 F.2d at 464), and it was unquestionably sufficient to support his discharge (*McCarthy*, 924 F.2d at 688).

To be sure, Bagnell questions the quality and thoroughness of his employer's investigation. Much of his presentation is devoted to contending that his termination was not based in fact because the allegations against him were not adequately substantiated. Claiming to have an explanation for each item, he urges that Komatsu Dresser was remiss in having failed to explore his purportedly exculpatory evidence.[9] Needless to say, Bagnell doesn't help his cause much by adding the bizarre argument (Mem. 3) that "no KDC employees were trained in the correct method for completing expense reports"—as though anyone needs to be told not to submit a blatant swindle sheet.

But quite apart from Bagnell's obvious difficulty in explaining away repeated documentary alterations on his part,[10] this Court must reject his invitation to second-guess Grzelak's reliance on Lovell's detailed investigative report. *Billups v. Methodist Hosp. of Chicago*, 922 F.2d 1300, 1303, 1304 (7th Cir.1991) (footnote and citations omitted) has explained in a similar (or if anything less egregious) situation:

> Plaintiff also presented evidence in an attempt to demonstrate that Bethany's explanation was not genuinely held by the employer because it lacked a basis in fact. To support this contention, Billups offered evidence designed to show that the investigation conducted by Davidson was somehow deficient. In this regard she asserted ... that the investigation did not "turn up anything" or corroborate the alleged events....
>
> * * * * * *
>
> Even if the events [as found by the investigation leading to her discharge] were completely uncorroborated as Billups contended, the evidence presented does not raise doubts as to the genuineness of the employer's termination decision. In this regard, it appears that the thrust of plaintiff's argument is that a genuine issue of material fact precluding summary judgment exists because she disputes that patient abuse occurred. This argument is misplaced. It is not enough for the plaintiff to simply assert that the acts for which she was terminated did not occur. This court has held that an ill-informed decision or an ill-considered decision is not automatically pretextual if the employer gave an honest explanation for the termination.
>
> Thus, our inquiry in this case is not whether the alleged acts actually occurred. Rather, our inquiry is limited to whether the employer's belief was honestly held.

What remains, then, is to examine the second *Mechnig* method of showing pretext: whether the stated justification for Bagnell's termination "actually motivate[d] his dis-

8. Again the absence of direct evidence of the claimed impermissible motivation relegates Bagnell to the indirect method of proof.

9. Bagnell acknowledges, however, that Grzelak and Middleton did investigate one of the alleged discrepancies by interviewing a salesman named Ed Warner.

10. Even if Bagnell were right in his insistence that he could somehow account for the amounts claimed as expenses in other ways (a dubious assumption), surely an employer can reasonably view the crooked practice of doctoring records as itself causing the loss of necessary confidence in an employee whose job entails regular requests for reimbursement. Bagnell made a mockery of the entire notion of accountability by his falsifications, and no employer is required to put up with that from even the most productive employee.

charge" (864 F.2d at 1365) or whether, as Bagnell argues, it was instead a cover for a discriminatory motivation. On that score Bagnell advances two contentions:

1. Other similarly situated employees whose expense accounts allegedly contained the same sort of inaccuracies as his own were not fired, and the claimed differential treatment stemmed from Bagnell's United States national origin.

2. Komatsu Dresser's investigation of Bagnell was instigated pursuant to a racially-motivated plot on defendants' part to replace him with an individual of Japanese descent.

1. *Komatsu Dresser's Treatment of Other Employees*

Bagnell complains that he alone was fired for the same kinds of breaches in expense-reporting policy that have been tolerated in other employees. Relying primarily on a report compiled by Paul Cogswell, his "expert" investigator who (after 225 hours or scrutiny) collected a list of 126 purported discrepancies in the expense account reporting of various other Komatsu Dresser employees (P. 12(n) ¶ 21), Bagnell Mem. 9 concludes that his alleged offenses were "common practice and policy of KDC sales force." Bagnell Mem. 10 goes on to summarize the results of the Cogswell report:

> Grzelak reviewed and signed error-filled expense reports of Jenkins Davis and Steve Day, also regional managers. Grzelak reviewed and approved the expense reports of his direct subordinates, including Bagnell, Davis, Day, Herman Voth and Kimijima. Inaccuracies, changed dates, incorrect receipts, and duplicate meals abounded on the receipts of all of Grzelak's subordinates yet Grzelak approved and signed these expense reports without question.

But Bagnell's position cannot withstand scrutiny on several levels.

Importantly, there is not even a whisper to suggest that Grzelak or any of the other defendants was aware of those other inaccuracies when Bagnell was fired.[11] Bagnell's unsupported attempt to impute such knowledge to Grzelak before Bagnell was fired is fabricated from whole cloth and cannot be credited. Once more *Mechnig,* 864 F.2d at 1366 provides a parallel—or perhaps more accurately, this case follows a fortiori from what was said there:

> Although Mechnig has introduced a great deal of factual material relevant to time card practices at Sears, his evidence does not bear in any significant manner upon the question of whether Hawley and the other individuals involved in Mechnig's termination were aware of time cards being improperly completed and administered Sears clear time card falsification policy in a discriminatory manner. Nearly all of the evidence supplied was from employees and lower level supervisors who were uninvolved in the termination decision. None of this evidence clearly implies that those who made the choice to terminate Mechnig knew of younger employees falsifying time cards and treated these employees more favorably than Mechnig.

Even beyond that fact (which is alone enough to defeat Bagnell's argument in this area), even the evidence assembled post hoc by Cogswell indicates that no other employee committed fraud on a level comparable to Bagnell's, an essential element in a successful disparate treatment case. Here too a parallel is provided by an earlier case in our Circuit, this time *Friedel v. City of Madison,* 832 F.2d 965, 974 (7th Cir.1987) (citations omitted):

> Plaintiffs have indeed alleged that the Department treated similar cheating situations involving minority or female recruits dissimilarly. Plaintiffs argue that "female and minority recruits also engaged in near-

11. If anything, Bagnell's effort to point triumphantly to the several audits that Komatsu Dresser conducted *after* terminating him actually cuts against him. Those other expense account reviews instead indicate the employer's being alerted to a possible problem by its unfortunate experience with Bagnell. Each of those later investigations concluded that violations were either harmless or else merited discipline short of termination. There is no indication of anything less than good faith on defendants' part or that the whole process was an attempt to whitewash the investigation and termination of plaintiff.

ly identical conduct" to that of plaintiffs.... In order to reach a jury on this question the plaintiffs needed only to offer specific facts suggesting that the police knew that other recruits were involved in cheating to the same extent as the plaintiffs. The plaintiffs have not, however, provided *any specific facts* that even arguably suggest that the police knew that minority and or female recruits were engaged in acts against the employer of "comparable seriousness," [citing *McDonald* and *McDonnell Douglas* ] to the acts of the plaintiffs. Plaintiffs have failed to support their bare contention that the police knew of such recruits, and the mere *belief*, without any factual support, that the police knew of such recruits and failed to discharge does not establish a genuine issue of material fact.

Again, the question is not whether the other recruits and the plaintiffs actually cheated to the same extent; it is whether the policy investigations revealed similar evidence of cheating on the part of the plaintiffs and the other recruits and chose to discharge the white males but retain minority and female recruits.

It is enough that Lovell's investigation concluded that in contrast to Bagnell's serious inaccuracies, Davis' and Day's reports raised only "minor" questions (D.App. Ex. 13; Lovell Dep. I 82–83). And any contention that Lovell's investigation did not uncover the same lesser mistakes that were later brought to light by Cogswell is wholly irrelevant (*Pollard v. Rea Magnet Wire Co.*, 824 F.2d 557, 559–60 (7th Cir.1987)).

And there is more (though more is not really needed): Bagnell has *confessed* to several of the accusations of what can only be characterized as deliberately deceptive expense reporting. That cannot be glossed over by his efforts at self-justification.[12] And that confession of intentional misreporting sharply distinguishes Bagnell's situation from those of the other persons whom he labels as violators, none of who is shown by the record to have acknowledged such intentional misdeeds. Bagnell's own P. 12(n) ¶¶ 127–38 reflect that all of the other employees confronted with discrepancies either denied the allegations or respond that they had made mistakes, as opposed to their admitting that they had engaged in knowing falsifications. Again *Friedel*, 832 F.2d at 974 n. 7 (citations omitted) provides a comparable factual matrix:

It is these admissions that to a large extent separate this action from other summary judgment actions involving motive. Admissions have by their very nature considerable probative value, and thus, when combined with other telling evidence may in particular cases, such as this one, allow the grant of summary judgment even where motive is at issue by establishing that even after all inferences are drawn in favor of the nonmovant he has established no factual issue.

Accord, *Morgan v. Harris Trust & Sav. Bank*, 867 F.2d 1023, 1027 (7th Cir.1989) (per curiam).

One final nail in the coffin of Bagnell's attempt to demonstrate that he was dealt with more harshly than other comparable offenders is provided by his misdirected effort to contrast his treatment to that of other similarly-situated *Americans* —scarcely probative of his claim that he was discriminated against on the basis of his United States origin (see *Billups*, 922 F.2d at 1305). In that respect the relevant person upon whom to focus would of course be Kimijima. If Bagnell could demonstrate a material factual issue as to whether Kimijima was not terminated for committing what Komatsu Dresser knew to be substantially similar infractions, Bagnell could generate a reasonable inference that would avert summary judgment. But he cannot.

On that score Bagnell Mem 4 n. 3 asserts:

Despite Kimijima's expense report transgressions, he has not been discharged or disciplined. The expense report "investigation" of Bagnell lasted two weeks and he

12. Essentially he says that he cooked the records because he was concerned lest the real nature of his expenditures—though legitimate as a business matter—might not have passed muster by a reviewer. It is really absurd to suggest that an employer is not within its rights in rejecting an employee who indulges in such creative and uncontrolled recording of expenses (to put the matter most charitably to Bagnell).

was discharged. The investigation of Kimijima was never resolved.

But wholly apart from the significant differentiating factors of (1) what Komatsu Dresser knew about any flaws in Kimijima's reporting and (2) when it gained that knowledge, Bagnell's makeweight argument is doomed in objective terms—both because Kimijima's purported misconduct was *not* of comparable seriousness to Bagnell's and because Kimijima did *not* acknowledge intentional misreporting. Indeed, the evidence on both of those issues is clear and undisputed.[13] Hence Bagnell has not set out any facts that, even if assumed to be true, would reasonably imply that either Kimijima or any other person of Japanese or other non-United States origin was treated differently for similar infractions of which defendants were aware.

2. *Komatsu Dresser's Asserted "Plot"*

All of this leaves Bagnell relegated to the argument that even if he may have been the most serious violator of whom Komatsu Dresser was aware, the investigation that uncovered his wrongdoings was itself precipitated by impermissible motives—the desire to prefer someone of Japanese origin over Bagnell or anyone else of United States origin. In that scenario Bagnell's termination would have been triggered by his having turned out to be the most culpable of a group of employees of United States origin, one of whom had to become the sacrificial lamb in order to make a place for Kimijima. In that context Bagnell would have it that even if the evidence and his confessions would have provided ample justification for his termination, the very fact that he was investigated in the first place would be evidence of discriminatory treatment sufficient to get the case before a trier of fact.

That sort of hypothesis has somewhat the ring of the *Price Waterhouse* mixed-motives analysis, appropriate where both discriminatory and nondiscriminatory considerations have influenced an employer in making the adverse employment decision. *Price Waterhouse,* 490 U.S. at 232, 109 S.Ct. at 1781 says that its division of the burdens of proof between plaintiff and defendant applies "when it has been shown that an employment decision resulted from a mixture of legitimate and illegitimate motives."

That last reference to "legitimate and illegitimate motives" poses an interesting problem in the Title VII canon: Must an employer put up with a cheating employee just because the investigation that led to the detection of the employee's serious cheating was originally prompted by an *illegitimate* motive (to fill a job with a man instead of a woman, or a white instead of a black, or a United-States-born person over a foreigner)? Or to approach the problem from the other direction, is the crooked employee entitled to keep his or her job (or to recover money for losing it) even though the conduct at issue would provide a clear justification for his or her termination? Can the employee prevail by showing that his or her improper conduct would not have been uncovered but for the employer's desire to carry out an impermissible discriminatory goal, even though the employee fails utterly in showing that termination for the reason actually learned by the employer was itself impermissible (or even more strongly, even though it plainly appears that the justification for the ultimate termination was unquestionably valid)?

But those conceptual difficulties need not be confronted here. That is so because Bagnell fails at the step that is a precondition to reaching the just-described stage in the analysis: the need to tie the employer's conduct (at least by reasonable inference) to proscribed considerations of national origin (*Pilditch,* 3 F.3d at 1117–18; *St. Mary's Honor Center,* — U.S. at —, 113 S.Ct. at 2756; *Friedel,* 832 F.2d at 973–74).

To foster the notion that he was specially targeted for investigation because of his national origin, Bagnell attempts to portray a well-orchestrated conspiracy to remove him because of his United States origin and to

13. Prose Dep. II 66–68 referred in passing to a problem with one of Kimijima's lunches. For some reason, Bagnell's counsel did not develop that line of questioning for the transcript, but a memo written by Kimijima (P.App. Ex. 19) indicates that he made a mistake regarding meals on March 16, 1992, more than six months after Bagnell was terminated.

replace him with a Japanese person (his Mem. 5 (footnote omitted), 6):

> In February, 1991, KDC President Masahiro Sakane and KDC clammered [sic] to place a Japanese individual into a high-ranking position in the KDC sales force. However, KDC could find no reason to fire Bagnell. Because KDC had no openings in high-ranking sales positions, KDC created the position of Director of Marketing Support. A few months later, Bagnell was discharged in order to open his position to the Japanese individual, namely Ichiro (Ivan) Kimijima.
>
> * * * * * *
>
> Sakane wanted Kimijima in an important sales position. Tom Bagnell's position was perfect. It was high-ranking, in a profitable region, and second in command to Grzelak. As Bagnell had not come from the old guard at Komatsu or Dresser Construction, replacing him would not be resisted by the Dresser or Komatsu people.

P.Mem. 7 then goes on to theorize that "defendants moved Bagnell out and Kimijima in" as Kimijima allegedly began to assume some of Bagnell's former roles and gained access to his staff, including his secretary. To implement the asserted plot, Bagnell contends, Vice President of Human Resources Middleton directed Patricia Hanrahan to communicate with Susan Cabaniss, a former human resources employee, "for the unverifiable 'dirt' Middleton knew Cabaniss would provide on Bagnell" (*id.* at 6).[14] And to expand the claimed web of conspiracy, Bagnell, *id.* asserts:

> In early 1991, Middleton, Grzelak, Tucker[15] and Hanrahan discussed firing Bagnell but decided that his good performance stood in the way, even though they had not given him a performance evaluation for 1990.[16]

As for Komatsu Dresser's asserted ultimate decision to replace the United-States-origin Bagnell with the Japanese-origin Kimijima, P.Mem. 8 further exposes the stab-in-the-dark groping nature of Bagnell's speculative theory. Here is Bagnell's confusing description of the final transaction:

> Grzelak's unsuccessful efforts to hide President Sakane's role in bringing Kimijima from Japan (and Grzelak's own noninvolvement in the decision), and Kimijima's ongoing contact with Sakane demonstrate that Sakane made the decision to place Kimijima in the regional manger position. After Grzelak offered Kimijima the regional manager position, a position Kimijima did not ask for, Kimijima discussed it with Sakane. From the day Kimijima learned he was coming to KDC, President Sakane was his contact.

That too typifies Bagnell's entire approach of indulging in rank speculation lacking any support from the record.

It is really unnecessary to go on. This Court has pored over the entire record and the voluminous submissions from the litigants. It has read and reread Bagnell's account of events, and the farfetched conspiratorial story spun in his memorandum (which is completely devoid of supporting citations to the evidentiary record) is simply not corroborated by the evidence itself, no matter how it is buttressed with any inferences reasonably drawn from that evidence.

It would take pages to address each of the gossamer strands from which Bagnell seeks to weave his imaginary conspiratorial web. In candor, the trip is simply not worth it. Instead of providing any substantiation whatever for his national-origin conspiracy theory, Bagnell's GR 12(n) statement (his only submission that cites to any evidence) contains either facts that do not suffice to avert summary judgment even if they are credited or

14. That pejorative characterization is not supported by the record.

15. [Footnote by this Court] Arlie Tucker is Komatsu Dresser's Executive Vice President.

16. [Footnote by this Court] That misstates the record seriously. In fact the record references show that the conference was held to discuss the need to cut back one sales Region, and to decide which Region would go and which Regional Manager would be terminated. In fact one Region *was* eliminated in February 1991 and one Regional Manager *was* let go—but that was not Bagnell, whose sales group was actually enlarged somewhat! So much for that strand of the fabricated "conspiracy."

non-facts that are wholly without support in the record.

Indeed, in material part Bagnell's effort to construct a discrimination-based rather than legitimate motive for his termination actually backfires. At least three facets of the evidence confirm the total implausibility of an already unpersuasive theory.

For one thing, P.Mem. 3 points to Bagnell's sales record ("Indeed, Grzelak considered his performance excellent and testified that Bagnell was his best regional manager") in an attempt to draw the inference that the investigation of his irregularities was unwarranted. Quite apart from the principle that past performance cannot salvage a current malfeasant (*Young In Hong,* 993 F.2d at 1262), Bagnell's argument really cuts against him. If he is correct that Komatsu Dresser's management set out to fire a Regional Manager just to make room for a Japanese national, why would it choose its "highest producing regional manager" (P.Mem. 3)? Thus Bagnell's fanciful theory is, among its other faults, strongly counter-intuitive (just so, *Young In Hong,* 993 F.2d at 1266 found a national origin discrimination theory implausible "after eight years of a basically satisfactory and uneventful working relationship" and positive evaluations).[17]

As a second factor negating any preconceived Komatsu Dresser plot to discriminate in favor of the only Japanese national in the relevant cast of characters, Grzelak testified—with no reason to discredit his testimony—that he originally considered three internal candidates (Kimijima, Jimmy Slavins and Bob Olson) to supplant Bagnell, after which the field was narrowed to Kimijima and Slavins. Grzelak went on to state that it was then determined that Kimijima was the most qualified for the job (Grzelak Dep. IV 28). Bagnell's only attempted counter is a misrepresentation of the record on the subject (P. 12(n) ¶ 63, mischaracterizing the portion of Grzelak's deposition cited there).

Finally, another aspect of the predominantly United-States-origin makeup of the Komatsu Dresser personnel somewhat further undercuts Bagnell's already hopelessly tenuous conspiracy theory. This is not simply a matter of the company's demonstrated lack of hostility to the idea of employing United States nationals in highly responsible executive positions (see *Murray v. Thistledown Racing Club, Inc.,* 770 F.2d 63, 68 (6th Cir.1985)). More to the point, Bagnell himself (not defendants!) has highlighted Komatsu Dresser's policy of keeping the number of Japanese individuals employed in the United States at a constant level (P. 12(n) ¶¶ 72–73):

> 72. KDC has a policy of sending a Japanese individual back to Japan when a Japanese individual is sent to the United States, according to a written transmission dated February 15, 1991. (Hioki Dep p.76; Exhibit 6 Bates Stamped D 956).
>
> 73. KDC planned to send a sales manager, Tosh Yasukawa, back to Japan when Kimijima was brought to KDC, as there were no Japanese regional managers to send back. (Exhibit 6).

That acknowledged policy certainly reduces any likelihood that a preconceived desire to bring in a Japanese national motivated the decision to get rid of Bagnell, for Kimijima's arrival would not have increased the proportion of Japanese representation at the American branch (to the same effect, *St. Mary's Honor Center,* —— U.S. at ——, 113 S.Ct. at 2748 n. 2 noted with apparent approval that the district court had considered that "the number of black employees at St. Mary's remained constant" in rejecting a finding of discrimination in a Title VII case)).[18] Hence the established pattern of

17. Relatedly, it would appear self-destructive for Komatsu Dresser to set out to substitute Kimijima, a foreigner with a very limited background in the American market, for the highly successful Bagnell and thus nullify his years of business contacts. P. 12(n) ¶ 50 describes Bagnell's connections with 28 distributors and details how Regional Managers were expected to devote their efforts to building such relationships. That casts further doubt on the inferences that Bagnell asks this Court to draw.

18. To put the issue in another way, (though this point is simply an added factor buttressing an already-won case for Komatsu Dresser), the company's policy seems to negate its being an "unusual employer" as spoken of in *Kirk, 811 F.2d* at 354 n. 10:

numerical equilibrium also runs counter to the crux of Bagnell's premise that Komatsu Dresser had predetermined that it would supplant him with a Japanese national, thus rendering his theory even that much more unbelievable.

* * *

In sum, nothing in either branch of Bagnell's theory—Komatsu Dresser's treatment of Bagnell vis a vis other employees or its asserted preconceived plot to get rid of Bagnell in favor of Kimijima—holds water. Nothing indicates that anything was at work other than a desire to rid the company of an employee who, despite his proved talents as a salesman, had also proved in his boss' judgment to be cheating regularly on his expense account.

What this Court said in *Haynes v. Alumax Recycling Group Inc.*, 719 F.Supp. 707, 713 (N.D.Ill.1989), aff'd by unpublished order, 899 F.2d 16 (7th Cir.1990), is equally true of Bagnell:

> All Haynes has shown is that is possible to devise almost any story post hoc to mix facts with total fancy. As the proposed solution to a connect-the-dots puzzle, the lines it seeks to draw between the factual dots are the random paths of wild improbabilities rather than the straight lines of reasonable inferences.

Our Court of Appeals has been equally skeptical of employees' theories involving such elaborate but fancied plots (*Konowitz v. Schnadig Corp.*, 965 F.2d 230, 234 (7th Cir. 1992); *Palucki v. Sears, Roebuck & Co.*, 879 F.2d 1568, 1571 (7th Cir.1989)). Bagnell's imagination cannot generate—and it has not produced—any genuine issue of material fact to block an adverse summary judgment on his Title VII claim.

*Breach of Contract Claim*

Bagnell has also advanced a rather half-hearted 1–1/2 page attempt to assert that Komatsu Dresser breached his employment contract in discharging him. That theory is so patently flawed that it takes only a bit more space than that to dispatch it.

Illinois, which supplies the rules of decision on Bagnell's state law claim, is an employment-at-will state. *Duldulao v. St. Mary of Nazareth Hosp. Center*, 115 Ill.2d 482, 106 Ill.Dec. 8, 505 N.E.2d 314 (1987) did carve out a limited exception in holding that an employee handbook can give rise to a binding contractual obligation under certain circumstances. But *Duldulao, id.* at 490, 505 N.E.2d at 318 teaches that the exception applies only "if the traditional elements necessary for contract formation are present." That means among other things (1) that the document must contain a promise clear enough to allow the employee reasonably to believe that an offer has been made and (2) that the handbook must be disseminated in such a manner as to signal the offer.

Here Bagnell's problem is that Komatsu Dresser's employee handbook makes no promise, nor does it provide any sort of assurance, that the company would not discharge Bagnell. Exactly the opposite is true—the handbook (D.App. Ex. 6 at 1, 17) contains language warning employees *not* to consider it a contract:

> To help you in your new job and to introduce you to the Company, we have prepared this employee handbook for you. It will inform you of your daily responsibilities in a general way, and it will let you know what the Company can do for you on an individual basis. This is your handbook—keep it handy where you can refer to it for any Company-related questions. This handbook should be viewed as a guideline for the implementation of our policies and not a binding contract. KAC may modify or deviate from any provisions of this handbook without notice....
>
> * * * * * *
>
> Remember that this Handbook contains general information about Company policies and should not be interpreted as a

At a minimum, it seems that some modification of the "minority group" circumstance is necessary in a reverse discrimination case. *See Murray v. Thistledown Racing Club, Inc.*, 770 F.2d 63 (6th Cir.1985) (Reverse discrimination plaintiff must produce evidence of "background circumstances [that] support the suspicion that the defendant is that unusual employer who discriminates against the majority.")

binding agreement. No rights shall accrue by reason of or arising from any statement made in or omitted from this handbook. Complete policy statements and details may be obtained from the Finance & Administration Department.

These disclaimers squarely block any finding that the handbook "contain[s] a promise clear enough that an employee would reasonably believe that an offer ha[d] been made" (*Moore v. Illinois Bell Tel. Co.*, 155 Ill. App.3d 781, 784, 108 Ill.Dec. 358, 360, 508 N.E.2d 519, 521 (2d Dist.1987), quoting *Duldulao*). It must be held (as in *Doe v. First Nat'l Bank of Chicago*, 865 F.2d 864, 873 (7th Cir.1989)) that the employee handbook did not give rise to a contractual relationship.

Equally fatal to any breach of contract claim is the fact that the handbook explicitly states that falsification of company records subjects an employee to termination without notice (D.App. Ex. 6 at 7). Thus even had Bagnell been correct in asserting that a contract had been formed (as he is not), his discharge would not have constituted a breach.[19]

In sum, Bagnell's breach of contract claim is wholly without merit. He fares no better on that ground than he did under Title VII.

*Conclusion*

There is no genuine issue of material fact, and Komatsu Dresser is entitled to a judgment as a matter of law. This action is dismissed.

*SUPPLEMENT TO MEMORANDUM OPINION AND ORDER*

SHADUR, Senior District Judge.

This Court's November 30, 1993 memorandum opinion and order (the "Opinion") dealt with the two claims that were advanced by Thomas Bagnell ("Bagnell") in his original Complaint, finding each of them to be without merit and entering summary judgment against Bagnell. As a result of a post-Opinion inquiry to this Court's chambers by counsel for defendants, this Court's attention has been called to certain respects in which the Opinion should be clarified as to the ultimate posture of the case. This supplement accordingly amends the Opinion and the consequent judgment order in those respects.

First of all, after the motion for summary judgment had been fully briefed by the parties, in September of this year Bagnell had sought and obtained leave to file an Amended Complaint ("AC") adding two counts:

1. Count III, which sounded in defamation against Jon Middleton ("Middleton"), who had been dismissed voluntarily as a defendant to the original Complaint in March 1992; and

2. Count IV, which sought to recover wages and attorneys' fees under an Illinois statute and was asserted against all of the remaining defendants in the original Complaint plus Middleton and David Grzelak ("Grzelak," who had also been dismissed voluntarily as a defendant at the same time as Middleton).

Through oversight those new claims were not touched upon in this Court's lengthy Opinion. To set the record straight on that score, this Court now dismisses AC Counts III and IV under the authority of *United Mine Workers v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966)—a dismissal that is expressly made *without* prejudice to those claims being reasserted in a state court of competent jurisdiction.[1]

19. This discussion has assumed that Bagnell can look to the employee handbook to being with. That is not entirely clear, for the handbook literally covers Komatsu America's employees, not Komatsu Dresser's (the latter corporation had not yet been formed at the time the handbook was distributed). But if Bagnell *can* invoke the handbook, he loses for the reasons stated in the text—and if he *cannot*, he has no contract claim to begin with.

1. When on September 24 this Court granted leave orally to file the AC, it commented on the frankly outrageous conduct of defense counsel in having inserted the words "with prejudice" in the draft order of dismissal that counsel had prepared when those same claims had originally been made the subject of suit in the Circuit Court of Cook County. Defense counsel had obtained the dismissal of that lawsuit on the basis that *this* action was a prior action pending, thus calling 735 ILCS 5/2-619(a)(3) into play. But as a matter of both logic and case law, any such dismissal is necessarily *without* prejudice. This Court accordingly orders defense counsel, if and when Bagnell may seek to reassert the same claims

There is another aspect of the case that should also be clarified—that relating to the current identity of all of the parties defendant. This supplement to the Opinion therefore turns to that subject.

As already indicated, Middleton and Grzelak were voluntarily dismissed as defendants by Bagnell in March 1992, only to be reinserted via the AC in late September of this year. To avoid any possible confusion as to whether all claims as against all parties have been resolved (a matter as to which the waters were muddied by the manner in which the AC was drafted), this Court hereby confirms that Middleton and Grzelak are also entitled to a judgment as a matter of law under Counts I and II, and those counts are dismissed as to them with prejudice.

As for the corporate defendants, Opinion at 1 n. 1 has confirmed that no such entity as Dresser Construction Machinery exists. To button up any loose ends in that respect, it is ordered dismissed with prejudice. Finally, this Court confirms that both Komatsu Dresser Company and Komatsu American Corporation are entitled to a judgment as a matter of law on Counts I and II, and those counts are dismissed with prejudice as to those defendants.

Date: December 10, 1993

once again in the Circuit Court, not to advance any contention that either the earlier dismissal or this dismissal (of course) was with prejudice.