Walter E. PILDITCH, Plaintiff–Appellee,

v.

BOARD OF EDUCATION OF the CITY OF CHICAGO, a Body Corporate and Politic; Fitz Barclay, Jr., Marty Gool, Esther Morgan–Watts, Calvin L. Pearce, and Willia Robinson, as Members of the Morgan Park High School Local School Council; Grady C. Jordan, as District Superintendent, High School District 11, Chicago Board of Education, Defendants–Appellants.

Nos. 92–3932, 92–4050.

United States Court of Appeals, Seventh Circuit.

Argued May 13, 1993.

Decided Aug. 27, 1993.

Rehearing and Suggestion for Rehearing In Banc
Denied Sept. 21, 1993.

Robert A. Berghoff (argued), Christopher J. Berghoff, Chicago, IL, for plaintiff-appellee.

Ronald S. Samuels (argued), Samuels & Associates, Chicago, IL, for defendants-appellants.

Before CUMMINGS, POSNER and EASTERBROOK, Circuit Judges.

CUMMINGS, Circuit Judge.

In an effort to give parents and local citizens more control over the public school system, the Illinois Legislature in 1989 passed an education reform measure that created local councils in each school district and invested them with the power to hire and fire principals. 105 ILCS 5/34–2.2. Principals accustomed to job security were stripped of

tenure and made to serve under four-year renewable contracts. One casualty of the new system, Walter E. Pilditch, brought this reverse discrimination suit claiming that the only reason he was fired from his position as principal of Morgan Park High School in Chicago was his race; Pilditch is white. He sued five of the ten elected members of the local school council, all minorities, who did not vote to renew his contract when it expired on June 30, 1990, along with the Chicago Board of Education and the district superintendent who chose Pilditch's replacement when the local council could not agree on a candidate.

Plaintiff requested damages based on lost wages and pension benefits under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–2(a)(1), and 42 U.S.C. §§ 1981 and 1983. Originally Pilditch also sought reinstatement at Morgan Park, but by the time the case was tried before an advisory jury, he had landed a position at another Chicago school; he is now principal at Curie High. The trial judge dismissed the Board of Education from the suit as a matter of law and the jury found that the plaintiff had failed to prove his case against the superintendent, Grady C. Jordan, and Esther Morgan–Watts, a local council member who had voted to oust him. But the jury rendered a verdict in Pilditch's favor on all counts against three council members—Marty Gool, Calvin L. Pearce and Willia Robinson—and he prevailed against a fourth council member, the Rev. Fitz Barclay, Jr., on the Title VII claim. The jury awarded Pilditch $62,085.03 in compensatory damages and levied punitive damages in various small amounts ($1,000 to $3,000) against the four defendants deemed to have violated the principal's civil rights. Judge Hart decided that the jury's verdict was merely advisory because the right to a jury trial in such cases hinges on the Civil Rights Act of 1991, which was passed by Congress after the local council voted to fire Pilditch but before his suit came to trial. Based on our decisions in *Banas v. American Airlines*, 969 F.2d 477 (1992), and *Luddington v. Indiana Bell Tel. Co.*, 966 F.2d 225 (1992), he concluded that the Act did not apply retroactively—thus Pilditch was not entitled to a jury. Nevertheless, he adopted the jury's findings except that he negated the punitive awards and found that, in addition to the $62,085.03 in lost wages, Pilditch should receive another $92,465, the discounted present value of the pension benefits he forfeited under the council's decision. Although we recently agreed to consider whether the Civil Rights Act of 1991 is retroactive in these circumstances, *Mojica v. Gannett Co., Inc.*, 986 F.2d 1158 (1993) (granting a rehearing en banc), it makes no difference to our resolution of this case whether Pilditch was entitled to a jury or not because, no matter who the factfinder is, this Court is unable to locate in the record sufficient evidence to support the plaintiff's allegation that he was discriminated against because of his race.

■ We review the district court's findings of facts for clear error and its findings of law de novo. *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 105 S.Ct. 1504, 84 L.Ed.2d 518. We give mixed findings of facts and law deferential review. *FDIC v. Bierman*, 2 F.3d 1424, 1430 (7th Cir.1993). Pilditch, a thirty-seven-year veteran of the Board of Education and the principal at Morgan Park from March 1984 through June 1990, lost his job at a February 21, 1990 local council meeting when he could not muster a majority of votes to renew his performance contract for four more years starting that July. Under 105 ILCS 5/34–2.2(c), six of the ten elected members of the council have to vote affirmatively to renew a principal's contract. The council is made up of six parents, two teachers and two members of the community, along with a student who may not vote. At the February 21 meeting, defendants Barclay, Gool, Morgan–Watts and Robinson (all parent members) voted not to renew Pilditch's contract, and defendant Pearce abstained. Morgan–Watts, who was found innocent of the allegations by judge and jury, is Hispanic; the other members who voted to fire Pilditch are black. After dismissing Pilditch, the local council solicited applicants for the vacant position. Roughly thirty-five people applied, including Pilditch, and thirteen were interviewed by most council members. Pilditch made that cut and one more—he was among the three finalists. The other two, Richard Kerr and Earl

Bryant, are black. They have comparable experience to Pilditch, both have been principals for some years, and there is no suggestion that either was any less qualified than Pilditch to be principal of Morgan Park. In keeping with the provisions of the Illinois reform act, the local council voted on the three finalists but none of the candidates polled the seven votes required to select a new principal (as opposed to the six required to retain a principal). Thus the three names were submitted to the superintendent, defendant Grady C. Jordan, who gave the nod to Earl Bryant. Jordan is also black.

 In the absence of direct evidence, a plaintiff in Title VII, § 1981 and § 1983 actions must abide by the complicated formula first set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–805, 93 S.Ct. 1817, 1824–1825, 36 L.Ed.2d 668 (1973), for proving discrimination by indirect evidence. *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121, 105 S.Ct. 613, 621, 83 L.Ed.2d 523 (1985); *St. Mary's Honor Ctr. v. Hicks*, —— U.S. ——, ————, n. 1, 113 S.Ct. 2742, 2746–2747 n. 1, 125 L.Ed.2d 407 (1993). First the plaintiff must establish by a preponderance of the evidence a prima facie case of racial discrimination. Having done so, it is presumed that the employer has discriminated because of race unless he can articulate some other, legitimate reason for the rejection. If the trier of fact believes the evidence and the employer is silent in the face of the presumption, the court must enter judgment for the plaintiff because no issues of fact remain. *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 254, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1981). But if the employer does explain, the presumption shifts again—it is assumed that the employer did not discriminate—and the plaintiff must demonstrate that the employer's stated reason was pretextual (or phony, as we explained in *Visser v. Packer Eng'g Assoc., Inc.*, 924 F.2d 655, 657 (1991)), and ultimately that the employer's real reason for action was discriminatory. *Hicks*, —— U.S. at ——,

113 S.Ct. at 2749. The *McDonnell Douglas* framework "simply drops out of the picture" after the employer has offered a legitimate non-discriminatory reason for the firing, *Hicks*, —— U.S. at ——, 113 S.Ct. at 2749, and the plaintiff retains the ultimate burden of persuading the trier of fact that he was discriminated against because of some illegitimate concern, in this case race, *United States Postal Service Bd. of Governors v. Aikens*, 460 U.S. 711, 716, 103 S.Ct. 1478, 1482, 75 L.Ed.2d 403 (1983). Thus showing pretext alone is not sufficient for the plaintiff to carry the day, although it may support an inference that the real reason for the employer's action is discriminatory. *Hicks*, —— U.S. at ——, 113 S.Ct. at 2749.

 We agree with the district court that Pilditch was able to establish a prima facie case of reverse discrimination. Under *McDonnell Douglas*, a prima facie case is made out by showing that the plaintiff is a member of a racial minority group, that he applied for and was qualified for a job for which the employer was seeking applicants, that he was rejected, and that afterward the position remained open to others with the complainant's qualifications. 411 U.S. at 802, 93 S.Ct. at 1824. Pilditch of course is not a member of a racial minority—this case involves alleged discrimination against a white by blacks. But the prima facie elements were never meant to be applied rigidly. *Id.* at 802 n. 13, 93 S.Ct. at 1824 n. 13. The most likely adaptation of the prima facie case to these unique circumstances, where Pilditch was both fired and then not hired for the vacant position he used to hold, would have him prove that he was meeting the employer's legitimate expectations, was adequately qualified for the job, was fired or not hired, and that the employer found a replacement of a different race. See *Hong v. Children's Memorial Hosp.*, 993 F.2d 1257, 1261 (7th Cir.1993); *Weiss v. Coca–Cola Bottling Co. of Chicago*, 990 F.2d 333, 336 (7th Cir.1993); *Fisher v. Transco Serv.–Milwaukee, Inc.*, 979 F.2d 1239, 1243 (7th Cir.1992).[1]

---

1. *McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 279–280, 96 S.Ct. 2574, 2578, 49 L.Ed.2d 493 (1976), makes clear that Title VII was intended to protect members of the majority

from race-based discrimination as well as members of minority groups. However, it remains an open question whether the *McDonnell Douglas* formula applies to reverse discrimination claims.

Pilditch was fired and then not hired for his old position; he was certainly qualified for the job he held for six years—the state certified him, as well as his two main competitors, as such; and his replacement was black. The only tricky element is whether Pilditch was meeting his employer's legitimate expectations. Obviously he was not in the subjective sense since only half of the local council voted to renew his contract. But this alone cannot derail the plaintiff's case at this stage, because anytime an employer fired or demoted someone (as in every Title VII case of this kind), it would prove that the employee was not meeting expectations; the requirement, then, would be meaningless. The more relevant question is whether the employee is able to put on objective evidence that he is sufficiently competent to satisfy the legitimate expectations of an employer. In this case Pilditch was able to do so if only by showing that he had been hired as a principal at another school. Pilditch, then, was able to put forth a prima facie case of discrimination. After all, "the burden of establishing a prima face case of disparate treatment is not onerous." *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1094. As we recently reiterated, the initial elements of an indirect evidence prima facie case are relatively simple to prove, and are designed to see that the plaintiff can get beyond summary judgment even though direct evidence is absent. *Hong,* 993 F.2d at 1261–1262 (quoting *Randle v. LaSalle Telecommunications, Inc.,* 876 F.2d 563, 568 (7th Cir.1989)); Paul J. Gudel, *Beyond Causation: The Interpretation of Action and the Mixed Motives Problem in Employment Discrimination Law,* 70 Tex.L.Rev. 17, 24 n. 19 (1991).

■ The focus thus shifts to the defendants to offer a nondiscriminatory reason for their actions. *Burdine,* 450 U.S. at 259–260,

101 S.Ct. at 1096–1097. But this burden is also quite light; the employer need not persuade the court that he was actually motivated by the reason he gives and the mere articulation of the reason rebuts the prima facie case and puts the onus back on the plaintiff to prove pretext. *Id.* at 254–256, 259–260, 101 S.Ct. at 1094–1095, 1096–1097. Here the defendants cited a number of reasons, any of which would have been sufficient to negate the prima facie showing. After the council voted not to retain Pilditch, there was a disturbance at Morgan Park and Pilditch closed the school even though he lacked the authority to do so. This incident obviously could not have colored the decision to terminate Pilditch's contract in the first instance, since it had not occurred yet, but it may have had some effect on Pilditch's later failure to regain his old job, and the superintendent testified that the school-closing incident was his reason for choosing another candidate. Defendants also testified that Pilditch had allowed unsafe conditions to prevail in a laboratory, that he responded inadequately when a white teacher made a racial slur, and that he did not work well with departments in the school. One defendant testified that after six years it was simply time for a change in leadership and that the system needed to be shaken up. Still another testified that the initial vote not to renew Pilditch's contract was preliminary in the sense that he could still be rehired, but by firing him the council seized an invaluable opportunity to give other candidates serious consideration as well.

■ Having offered these apparently legitimate reasons, the *McDonnell Douglas* formula disappears, *Hicks,* —— U.S. at ——, 113 S.Ct. at 2749, and the plaintiff is left to unmask, if he can, the reasons proffered by the employer as fake. Beyond this, he must also prove that the true reason for his firing

See *Kirk v. Board of Educ. of Bremen Comm. High Sch. Dist. No. 228,* 811 F.2d 347, 354 n. 10 (7th Cir.1987); *Coates v. Johnson & Johnson,* 756 F.2d 524, 531 (7th Cir.1985); but see *Ustrak v. Fairman,* 781 F.2d 573, 577 (7th Cir.), certiorari denied, 479 U.S. 824, 107 S.Ct. 95, 93 L.Ed.2d 47 (1986) (*McDonnell Douglas* framework designed to protect women and minorities, not whites). The result in this case is the same either way because, as we will explain, the *McDonnell Douglas* framework drops out of the picture after the plaintiff has established a prima facie case of discrimination and the employer has put forth a non-discriminatory reason for his action (as was done here). At that point, after the *McDonnell Douglas* framework has served its purpose, the question is simply whether the plaintiff can prove that the employer acted because of an illegitimate motive. We have concluded for the reasons below that Pilditch cannot, and this result would be the same whether

was discriminatory. *Id.* This is where Pilditch fails; our review of the record suggests a singular lack of evidence to support the conclusion drawn by the judge and jury that Pilditch was fired and not rehired because he is white. As noted, the plaintiff always bears the ultimate burden of persuasion that he was the target of illegal discrimination. *Hicks,* —— U.S. at ——, 113 S.Ct. at 2747–2748.[2] In sum, here is the evidence that Pilditch put forth to prove the discriminatory intent of the local council members who voted against him: Calvin Pearce had a smile on his face when he abstained in the February 21, 1990 vote; Pearce, while touring the school's library, said that he felt the school needed a black male presence as part of a discussion about the paucity of African–American males in the teaching profession; and shortly after the vote to depose Pilditch, Willia Robinson let out what was described as a "whoop" and said, "We did it, girl." That's all. Of course we do not discount the possibility that gestures and shifty glances may reveal as much about a person's attitude as his verbal statements, but attributing discrimination to a council member merely because he may have been smiling while voting (to abstain, no less) is unwarranted. Council member Pearce might have been smiling because he saw someone he knew in the crowd, or received a humorous note, or just made plans for dinner at a fine restaurant. Even if the smile were in fact the result of the vote to remove Pilditch, Pearce might have been glad only because he thought a better principal, not a black principal, would be Pilditch's replacement. In short, the smile might indicate something about how Pearce was feeling about the Pilditch vote, but not why he was feeling it.

Pearce did say that the school should have a stronger black male presence. The testimony on this point was as follows:

Q: And did he, during the course of his conversation with you, make any mention of race?

A: Yes.

Q: What particularly did he say and where was he when he said it?

A: Yes. He, in the library he wanted to know where the collections were on African–American studies and why weren't they prominently displayed in the front. And I showed then the collections and the library order and then the other displays. There were advertisements at the time from the black college fair. And then, in the hallway, he was looking around, and he said that he felt that the school needed a black male presence.

Q: Were those his words?

A: Yes.

Q: Did he enlarge upon that statement?

A: No. We got into a discussion on the problems in attracting African–American males into the teaching profession.

(Plaintiff's app. at 34.) By its own terms, Pearce's statement about the necessity of a stronger black male presence led to a discussion about the lack of black teachers, not black principals. In any event, there is no suggestion in the record that Pearce translated this general concern about black role models into a specific decision to oppose Pilditch because of his race. One could imagine other isolated statements that, coupled with action, might give rise to an inference of discrimination. If, for example, Pearce had made statements to the effect that he disliked or distrusted whites in general and

or not *McDonnell Douglas* applies to this reverse discrimination claim.

**2.** Under *Price Waterhouse v. Hopkins,* 490 U.S. 228, 242, 109 S.Ct. 1775, 1786, 104 L.Ed.2d 268 (1989), even if the employer does take race into account, the plaintiff will still not prevail if the employer can "prove that, even if it had not taken [an impermissible characteristic] into account, it would have come to the same decision regarding a particular person." This is the so-called mixed-motives case. If an employer has one acceptable motive and one unacceptable motive, and the acceptable motive is sufficient

grounds for dismissal, the fired employee has no case. *Visser,* 924 F.2d at 658; see Candace S. Kovacic–Fleischer, "Proving Discrimination After *Price Waterhouse* and *Wards Cove:* Semantics as Substance, 39 Amer.U.L.Rev. 615 (1990). However, the Civil Rights Act of 1991 overrules *Price Waterhouse* on this point and makes an employment decision illegal if it was motivated at all by an illegitimate motive. 42 U.S.C. § 2000e–2(m). As noted, we have yet to decide whether the new Civil Rights Act would apply to this case. But because we find no evidence of illegal motive by the local council members, there is no need to dwell on the mixed-motives issue.

could not judge them fairly, it might be possible to assume that his decision about Pilditch was spurred by racial concerns. But merely lamenting the absence of black male teachers as role models in schools with large black populations—a widely held view, by the way—in a discussion that did not involve Pilditch at all cannot be taken as proof of discriminatory intent without some other supporting evidence.

Finally, Willia Robinson let out a "whoop" and said "We did it, girl" as she entered the women's bathroom five to ten minutes after the vote. One witness testified that "as the door closed, there was all kinds of ruckus, laughter, and silliness" (plaintiff's app. at 39). Like Calvin Pearce's smile during the voting, Robinson's statement may suggest that she was elated by the fact of Pilditch's ouster, but it does not convey any reliable information about why she voted the way she did. A joyful whoop at the firing of a principal suggests dislike of the principal, it is true, but all dislike is not based on race.

Recall that the local council system was part of an educational reform package designed to give parents and community members more control over the schools. By putting the power to hire and fire principals in the hands of non-professionals, the Legislature must have realized that local councils would make changes for changes' sake as a way of exerting their newfound authority, even if there were not glaring deficiencies in a principal's leadership. The only way to conclude based on this paltry record that the plaintiff was discriminated against because he was white is to make the illogical and insupportable assumption that every time a black council member votes against a white candidate, the decision is motivated by race. This is impermissible. *Ustrak*, 781 F.2d at 576–577. "Racial discrimination against whites is forbidden, it is true, but no presumption of discrimination can be based on the mere fact that a white is passed over in favor of a black." *Id.* at 577. The notion that all black decision-makers are driven by this single issue rests on just the type of stereotype the civil rights laws were designed to prevent from infecting personnel decisions; it would be painfully ironic if those same laws were here used to perpetuate such stereotypes. Mere subjective beliefs by the plaintiff—without the backing of hard evidence—cannot prove that an action was inspired by improper motivations. *McMillian v. Svetanoff*, 878 F.2d 186, 190 (7th Cir.1989).

At oral argument we pressed counsel for Pilditch to spell out what specific evidence in the record showed that the defendants intentionally discriminated against his client. To our repeated entreaties, he could only respond that we must look at the totality of the circumstances. We have. Because there is no proof of discrimination, the district court's judgments against the four defendants are reversed.