Cathy CARSON

v.

**BETHLEHEM STEEL CORPORATION.**

No. 2:93 CV 290 JM.

United States District Court,
N.D. Indiana,
Hammond Division.

March 17, 1995.

---

Garry A. Weiss, Merrillville, IN, Charmaine E. Dwyer, Chicago, IL, for plaintiff.

Larry G. Evans, Hoeppner, Wagner and Evans, Valparaiso, IN, for defendant.

## ORDER

MOODY, District Judge.

Bethlehem Steel Corporation fired Cathy Carson from her position as a print shop clerk in Bethlehem's engineering department. Carson alleges that in doing so Bethlehem discriminated against her on account of her race, which is white. This allegedly in violation of Title VII of the Civil Rights Act of 1964. *See* 42 U.S.C. § 2000e–2(a).[1] Bethlehem has moved for summary judgment. *See* FED.R.CIV.P. 56. Bethlehem's motion is **GRANTED.**

### I.

"[S]ummary judgment is appropriate—in fact, is mandated—where there are no disputed issues of material fact and the movant must prevail as a matter of law. In other words, the record must reveal that 'no reasonable jury could find for the non-moving party.' " *Dempsey v. Atchison, Topeka and Santa Fe Ry. Co.*, 16 F.3d 832, 836 (7th Cir.1994) (citations omitted). In this case the court concludes that no reasonable jury could, upon the undisputed record, find that Bethlehem discriminated against Carson because she is white.

### II.

The following facts are, except where otherwise noted, undisputed.

Carson and three other women were hired to work in the print room of Bethlehem's engineering department. Including Carson,

three of the women were white and one was black. Each came to Bethlehem through a temporary agency called Star Personnel. When Bethlehem bought out their contracts with Star, the women were given a 65–day probationary period in which to prove themselves to Bethlehem. Fifty-eight days after beginning her probationary period, Carson was fired.

Bethlehem policy called for probationary employees to be periodically evaluated. In Carson's case, these evaluations were completed by her direct supervisor, Thomas Gobernatz, who is white. Gobernatz completed his first written evaluation of Carson 29 days into her probation period. That evaluation reads, in part:

Manner in which the employee's performance is substandard:

1. The amount of time it takes to run prints is below acceptable standards at this time.

2. Cathy seems to be having trouble adjusting to the work environment in the Print Room (i.e. jumping from one job to another as required).

3. Cathy also is having trouble getting along with her co-workers.

4. She also has been having problems misfiling original drawings, erasing cards and recording original drawing's location.

Gobernatz Aff., Ex. E–1. Gobernatz also states in the evaluation that Carson was: reinstructed in certain areas, given a list of work standards and told "that everyone in the print room must cooperate with each other." *Id.*

At 56 days into Carson's probationary period, Gobernatz completed another written evaluation of Carson's performance. In that evaluation, Gobernatz noted that Carson's performance continued to be substandard. Gobernatz Aff., Ex. E–2. Gobernatz wrote that "[t]ension in the print room between

---

1. Section 2000e–2(a) provides, in relevant part:
   It shall be an unlawful employment practice for an employer—(1) to fail or refuse to hire or to discharge *any* individual, or otherwise to discriminate against *any* individual with re-

spect to his [or her] compensation, terms, conditions, or privileges or employment, because of such individual's race, color religion, sex or national origin.
42 U.S.C. § 2000e–2(a).

Cathy and the other three clerks has improved some, but not completely." *Id.* Gobernatz recommended that Carson be terminated, explaining:

Cathy has not performed to the level which is expected in this position. She is not recalling originals in a timely manner, is still misfiling Burns Harbor drawings in Vendor drawing file drawers, not marking cards with original drawing locations and is taking longer than normal time to file original drawings. Cathy is also not doing a thorough enough job checking in original drawings from Record Center.

Gobernatz Aff., Ex. E–2. Gobernatz goes on to detail an example of Carson's incompetence. *See id.*

Carson herself supports Gobernatz's statements that she had problems getting along with her co-workers. Carson picks out several particular instances: for example, she notes that the other clerks (including, but not limited to, Linda Hatch) made fun of her for wearing a mask designed to protect her from ammonia fumes, *see* Carson deposition at 37–38; she points to an incident where Hatch called her a "bitch," *id.* at 25; she also states that Hatch once called her to ask how she could tolerate one of the other clerks, who was white, being so mean to her, *id.* at 36. Hatch was the one black employee in the print room. Carson testified that when she (Carson) was fired, she was told that "someone in the print department had to go" and it was going to be her. *See* Carson deposition at 20.

When Carson did go, Frank Carullo, head of the Engineering Department, had the final say whether to fire her. *See* Gobernatz deposition at 23. Carullo is white. Beverly K. McCollum, Bethlehem's Equal Employment Opportunity Coordinator, would have reviewed Carullo's decision to be sure it was free from inappropriate bias. *See* McCollum deposition at 6. McCollum is black.

Carson was ultimately replaced by another white woman.

Carson states that she was never shown copies of Gobernatz's negative performance reviews. Carson attests that a few weeks into the job, she and Hatch were called into a meeting with Gobernatz and Mary Jo Hopkins, Carullo's administrative assistant. Carson states that at that meeting both she and Hatch were told they were doing a good job. Carson attests to two other meetings with Gobernatz and Hopkins. Regarding the first of these meetings, conducted shortly after Gobernatz had completed his 29–day evaluation, Carson attests that: "Gobernatz told me that I was doing a good job. I was not informed at this meeting that my overall performance was unsatisfactory or that I would not be retained beyond my probationary period if my job performance did not improve." Carson Aff. ¶ 8. Regarding the second meeting, conducted after the 55–day evaluation, Carson attests that Gobernatz told her "that my work performance had continued to improve and that I was doing a good job but that I was being terminated due to tension among the employees in the print room." Carson Aff. ¶ 9.

Carson concentrates on her treatment in comparison to Hatch. Carson testified that Hatch missed two days of work in the print shop, once because she was in jail and once for a court appearance. Carson Deposition at 21. Carson also testified that Hatch was habitually late for work, whereas Carson was always prompt. *Id.*

Carson's argument that her termination was discriminatory is inextricably linked to her perception that McCollum was instrumental in the decision to fire her and that McCollum was biased against Carson because both Hatch and McCollum are black and Carson is white. Carson understood that Hatch and McCollum were "real close buddies." She notes, for example, that Hatch and McCollum rode into work together in the morning. This friendship is a contested point. To dispute it, Bethlehem points to McCollum's testimony that McCollum "truly hate[d]" driving people into work and charged Hatch to do so. McCollum deposition at 13. McCollum also testified that Hatch was "moody" and "was so angry with me for charging her she would not talk to me." *Id.* at 14.

### III.

To understand why these facts do not support a reasonable inference of discrimination,

the court reviews some elemental rules concerning Title VII.

■ Perhaps in Brigadoon resides the Title VII plaintiff who makes his or her case by direct proof of discrimination. Here in Hammond, and elsewhere in the Seventh Circuit, the typical Title VII case is built on circumstantial evidence, applied within the burden-shifting framework set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under *McDonnell Douglas,*

> the employee must first establish a prima facie case to create a rebuttable presumption of discrimination. The burden then shifts to the employer to articulate legitimate, nondiscriminatory reasons for the challenged employment action. If the employer is successful, the presumption dissolves, and the burden of production shifts back to the employee.

*Courtney v. Biosound,* 42 F.3d 414, 418 (7th Cir.1994) (citations omitted). With regard to the final stage of this analysis, the plaintiff's "burden of production" is, in essence, the same burden with which the plaintiff began. Thus, "[t]he fact-finder's disbelief of the reasons put forward by the defendant ... may, together with the elements of the prima facie case, suffice to show intentional discrimination...." *St. Mary's Honor Center v. Hicks,* —— U.S. ——, ——, 113 S.Ct. 2742, 2749, 125 L.Ed.2d 407 (1993); *see also Futrell v. J.I. Case,* 38 F.3d 342, 346 (7th Cir. 1994) (citing *Hicks* ).

There is language in some of the volume of Seventh Circuit case law on this subject that suggests some new burden of production arises for the plaintiff once a defendant comes forward with its legitimate, non-discriminatory reasons for its actions. *See, e.g., Courtney,* 42 F.3d at 422 (employee "cannot merely repeat his prima facie case in refuting [employer's] proffered reasons"); *Pilditch v. Board of Education,* 3 F.3d 1113, 1116 (7th Cir.1993) ("[I]f the employer does explain, the presumption shifts again—it is assumed that the employer did not discriminate—and the plaintiff must demonstrate that the employer's stated reason was pretextual.")

This language should not be interpreted as implying that a plaintiff cannot survive summary judgment without evidence above and beyond the prima facie case. As noted, the plaintiff's burden after an employer proffers its legitimate, non-discriminatory reason is essentially the same as the plaintiff's original burden. As the Seventh Circuit stated elsewhere in the *Pilditch* decision cited, *supra,* once the employer has explained its action in non-discriminatory terms, "the question is simply whether the plaintiff can prove that the employer acted because of an illegitimate motive." 3 F.3d at 1116–17 n. 1. The four *Hicks* dissenters framed the matter succinctly:

> The plaintiff has raised an inference of discrimination (though no longer a presumption) through proof of his prima facie case, and ... this circumstantial proof of discrimination can also be used by the plaintiff to show pretext. Such proof is merely strengthened by showing, through use of further evidence, that the employer's articulated reasons are false....

—— U.S. at ——, 113 S.Ct. at 2762 (Souter, J., dissenting) (citation omitted). The point derives from the unanimous opinion of the Court in *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 255 n. 10, 101 S.Ct. 1089, 1095 n. 10, 67 L.Ed.2d 207 (1981), that "there may be some cases where the plaintiff's initial evidence, combined with effective cross-examination of the defendant will suffice to discredit the defendant's explanation." *Burdine* is echoed by the *Hicks* majority, as quoted above, —— U.S. at ——, 113 S.Ct. at 2749, and by the Seventh Circuit in *Futrell,* 38 F.3d at 346.[2]

---

2. *Hicks* and *Futrell* acknowledge the potential of cross-examination to undermine an employer's ostensible legitimate non-discriminatory reasons. The cases conjure Wigmore's famous exhortation that cross-examination "is beyond any doubt the greatest legal engine ever invented for the discovery of truth." *See* 5 WIGMORE, EVIDENCE § 1367 (J. Chadbourne rev. 1974). As Justice Stevens recently pointed out, "[e]ven if one does not completely agree with Wigmore's assertion, ... one must admit that in the Anglo–American legal system cross-examination is the principal means of undermining the credibility of a witness whose testimony is false or inaccurate." *United States v. Salerno,* 505 U.S. 317, ——, 112 S.Ct. 2503,

On summary judgment, of course, no cross-examination is possible. Moreover, on summary judgment, the nonmovant is given the benefit of every doubt and—for a plaintiff in the Title VII context—"need only produce evidence from which a rational factfinder could infer that the company's proffered reasons were pretextual," *Courtney*, 42 F.3d at 418. A strong prima facie case may well be sufficient to raise a triable issue *vis-a-vis* an ostensible legitimate non-discriminatory reason for an employment action. This is even more so where the prima facie case is combined with a viable theory of cross-examination.

The symmetry between the plaintiff's burdens of production and persuasion before and after the employer articulates a legitimate non-discriminatory reason is important in the case at bar, where Carson alleges reverse discrimination. That is because although the Supreme Court "makes clear that Title VII was intended to protect members of the majority from race-based discrimination," *see Pilditch*, 3 F.3d at 1116 n. 1 (citing *McDonald v. Santa Fe Trail Transportation Co.*, 427 U.S. 273, 279–80, 96 S.Ct. 2574, 2578–79, 49 L.Ed.2d 493 (1976)), "it remains an open question whether the *McDonnell Douglas* formula applies to reverse discrimination claims," *id.* (discussing applicability of burden-shifting framework to fired white school principal); *see also Bagnell v. Komatsu Dresser Co.*, 838 F.Supp. 1279, 1283 (N.D.Ill.1993) (making same point where American asserted national-origin discrimination against Japanese company operating in the United States). This uncertainty concerning the applicability of *McDonnell Douglas* to reverse-discrimination claims means that "the exact contour of the prima facie case in such ... cases remains an unsettled question." *Bagnell*, 838 F.Supp. at 1283. Because it does not alter the analysis, however, and following Judge Shadur's lead in *Bagnell*, the court sees no need to broach here *McDonnell Douglas*'s applicability to such cases. The bottom line is that once an employer has articulated non-discriminatory reasons for its actions (as Bethlehem has done in this case), the plaintiff's case reduces (on summary judgment) to the following: whether the record can support an inference that, in fact, the employer acted in violation of Title VII.

Upon the present record, no reasonable jury could find that Bethlehem discriminated against Carson because she is white.

The circumstances belie an inference of discrimination. First, three out of four of Carson's co-workers in the print room were white. Second, those involved in making the decision to fire Carson were also white, except for McCollum. The evidence is undisputed that McCollum did not have the authority to make the final decision concerning Carson's dismissal. Moreover, no reasonable jury could infer, as Carson suggests, that McCollum acted as Hatch's proxy in getting rid of Carson because of Hatch and McCollum's allegedly race-based friendship. There is simply no evidence of such a friendship. To the contrary, the only evidence regarding Hatch and McCollum's relationship suggests hostility, with Hatch refusing to talk to McCollum after McCollum charged Hatch for rides to work. Neither is there evidence that McCollum (or Hatch, for that matter) harbored any animus toward white people. Finally, the fact that Carson was replaced by a white woman, while not dispositive, is certainly damning to the notion that she was fired for being white.

The evidence could not support, either, the inference that Bethlehem had no legitimate, non-discriminatory reason to fire Carson. Both of Carson's performance reviews reveal substandard work and an inability to get along with her co-workers. The fact that Carson was not shown copies of these reviews is neither here nor there. Carson does attest that Gobernatz told her she was doing a good job at her first meeting with him. This statement, however, even if Gobernatz made it (a contested point itself), does not create a material question of fact regarding Carson's work performance. "The mere submission of materials from a ... supervisor indicating that an employee's performance is satisfactory ... does not create a material issue of fact." *Anderson v. Baxter Health-*

2510, 120 L.Ed.2d 255 (1992) (Stevens, J., dissenting).

*care Corp.,* 13 F.3d 1120, 1125 (7th Cir.1994) .. In *Anderson,* a former supervisor attested in conclusory fashion that Anderson was not fired for performance-related reasons. *Id.* If that was insufficient to create a material factual dispute in that case, than Gobernatz's disputed hearsay statement offered by Carson here is clearly inadequate. This is particularly so in the presence of particularized evidence of Carson's failings provided *via* Gobernatz himself in Bethlehem's submissions.

Bethlehem offers a separate, independent ground for firing Carson, as well: mainly, Carson's disruptive presence in the print shop. On this point, Carson admits that she did not get along with her co-workers, black and white. Carson states that it was this reason that Gobernatz gave her for her termination at their second performance-review meeting. Carson offers no evidence that calls into question this legitimate, non-discriminatory reason for her to be fired. Carson simply argues that because she was the better worker, it should have been Hatch, and not herself, that was fired. This argument is misguided in its inception. "[A]n employer is free to choose an objectively less qualified candidate over a more qualified one." *See Courtney,* 42 F.3d at 423. In fact, an employer "can be as arbitrary as he wants—he just cannot treat an older employee [or a white employee] more harshly than a younger one [or a black one]" if the employee's age or race is the motivating factor. *See Palucki v. Sears, Roebuck & Co.,* 879 F.2d 1568, 1571 (7th Cir.1989). The issue is not who was the better employee, Hatch or Carson, but rather whether the decision to fire Carson was based on her race. Carson has wholly failed to adduce evidence suggesting that Bethlehem fired her because she is white.

*Conclusion.*

Given Carson's situation (her being a white person, being fired by white people and being replaced by a white person) and Bethlehem's proffered reasons for firing her (her inability to get along with co-workers and her poor job performance), Carson has failed to raise the possibility of a reasonable inference that she was fired because of racial animus. Bethlehem is, accordingly, entitled to summary judgment. The clerk is **ORDERED** to enter final judgment as follows:

Bethlehem Steel Corporation's motion for summary judgment is well-founded. Cathy Carson shall take nothing by her complaint.

**SO ORDERED.**

