**K.I. MORGAN COMPANY, INC., Plaintiff,**

v.

**CHICAGO TRANSIT AUTHORITY, Defendant.**

**No. 96 C 4891.**

United States District Court, N.D. Illinois, Eastern Division.

Nov. 20, 1998.

888

Lewis Myers, Jr., Chicago, IL, for K. I. Morgan Company, Inc.

Kathleen Hope Herrmann, Chicago Transit Authority, Corporate Law Dept., Chicago, IL, Brad L. Jansen, Chicago Transit Authority, Law Dept., Chicago, IL, for Chicago Transit Authority, Ken Trader, Christine Gambril.

### MEMORANDUM OPINION AND ORDER

GETTLEMAN, District Judge.

On August 8, 1996, plaintiff K.I. Morgan Company, Inc., an Illinois corporation, filed a three-count complaint against defendant, Chicago Transit Authority ("CTA"), a municipal corporation, alleging violations of 42 U.S.C. § 1981 and 1983 (Counts I and II) and common law breach of contract (Count III).[1] Plaintiff alleges that defendant's refusal to award it certain contracts was racially motivated. Plaintiff requests compensatory and punitive damages, and declaratory and injunctive relief.

In November 1996, defendant moved to dismiss plaintiff's complaint pursuant to Fed. R.Civ.P. 12(b)(6). Plaintiff received several

---

1. Several other defendants were originally named in this action, but were later either dropped or dismissed from the suit.

extensions of time in which to file its brief in opposition. After the motion was fully briefed, the court denied the motion in April. The case was then dismissed for want of prosecution on April 22, 1997, September 2, 1997, and October 16, 1997, because plaintiff failed to appear at scheduled status hearings. Each time, the dismissal was vacated on plaintiff's motion.

On March 13, 1998, defendant moved for summary judgment arguing that: (1) plaintiff has no evidence to establish that defendant's actions were racially motivated or discriminatory; and (2) the parties never entered into alleged contract. In support of that motion, defendant filed a statement of uncontested facts, along with supporting affidavits and deposition testimony as required by Local Rule 12M(3).

Plaintiff requested and received an extension to May 25, 1998, to file its response. Plaintiff, however, did not file its responsive brief until June 17, 1998, after requesting and receiving leave to file instanter. According to Local Rule 12N(3)(a), plaintiff was also required to file "a concise response to the movant's [12M] statement that shall contain . . . a response to each numbered paragraph in the moving party's statement, including, in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon." Plaintiff failed to do so, leaving defendant's statement of uncontested facts as automatically admitted. *See Petrovich v. Consolidated High School Dist. #230*, 959 F.Supp. 884, 887 (N.D.Ill.1997); *Bell, Boyd & Lloyd v. Tapy*, 896 F.2d 1101, 1102 (7th Cir.1990).

Plaintiff did file its own statement of additional facts, which it contended required denial of summary judgment, purportedly pursuant to 12N(3)(b). Most of these "facts," however, were contested and many did not include "references to the affidavits, parts of the record, and other supporting materials . . ." as required by Rule 12N(3)(b). On June 30, 1998, defendant moved to strike most of plaintiff's statement for failure to comply with the local rule. The court granted the motion on July 22, 1998. Because those facts remaining from plaintiff's 12N(3)(b) statement do not contradict defendant's 12M statement, defendant's version of the facts in this case are completely uncontested. Based on those facts, for the reasons set forth below, defendant's motion for summary judgment is granted.

## FACTS

Plaintiff is an African–American owned and managed company engaged in the business of chemical manufacturing. Rodney Morgan is plaintiff's president and sole shareholder. James Harris handles plaintiff's marketing, including preparation of bids. Defendant CTA is a municipal corporation that provides mass transit services in Chicago and surrounding communities. Since its incorporation in 1985, plaintiff has entered into at least four contracts with defendant.

In July 1995, defendant CTA published an advertisement for bids for paint/graffiti remover. Six companies, including plaintiff, submitted bids for the contract. Plaintiff submitted the lowest bid. However, five of the bids, including plaintiff's, were considered non-responsive as they did not meet the contract specifications. As a result, defendant decided to re-bid the contracts with revised specifications.

Upon learning that the contract would be re-bid, Harris and Morgan had a "heated" discussion with two of defendant's employees: Christine Gambril, manager of vehicle purchasing; and Parker Hand, a procurement administrator. Both refused to award the contract to plaintiff. Later that same day, Harris and Morgan met with Edward Gronkowski, general manager of defendant's purchasing department, to protest Gambril's decision. In his deposition, Morgan admits that they did not tell Gronkowski that they believed Gambril's decision was racially motivated. Gronkowski advised Harris and Morgan that because plaintiff had submitted the lowest bid, he would award it the contract, pending approval of plaintiff's product. The product was approved and the contract was executed in November 1995.

In April 1996, defendant published a request for bids on a contract to provide bus wash soap to defendant for two years. The

advertisement was placed by Ken Trader, another procurement administrator.[2] The contract specifications required that Material Safety Data Sheets be submitted with each bid. Trader determined that plaintiff's bid and the bid of a non-minority owned company were non-responsive because they did not include the required Material Safety Data Sheets. He then awarded the contract to Chicago United Industries, Ltd., a minority-owned company, because it was the lowest responsive bidder. Trader had not discussed the circumstances of the 1995 paint/graffiti remover contract with Gambril, Hand or any other CTA employee.

## STANDARDS FOR SUMMARY JUDGMENT

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *Cox v. Acme Health Services, Inc.*, 55 F.3d 1304, 1308 (7th Cir.1995). A genuine issue of material fact exists for trial when, in viewing the record and all reasonable inferences drawn from it in a light most favorable to the non-moving party, a reasonable jury could return a verdict for the non-movant. *Hedberg v. Indiana Bell Tel. Co.*, 47 F.3d 928, 931 (7th Cir.1995); *Lippert Marketing Ltd. v. Kingwood Ceramics, Inc.*, 1998 WL 699023, *10 (N.D.Ill.1998). Rule 56(c) mandates the entry of summary judgment against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and in which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir.1994). A scintilla of evidence in support of the non-moving party's position is not sufficient to successfully defeat a summary judgment motion; "there must be evidence on which the

jury could reasonably find for the [non-movant]." *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986); *Lippert*, 1998 WL at *10.

## DISCUSSION

### I. Counts I & II

In Counts I and II, plaintiff alleges that it was denied the contracts because of defendant's unwritten policy to deny African–Americans in general, and plaintiff in particular, equal treatment in the bidding process. Plaintiff also alleges that because plaintiff exposed and challenged this policy, it was particularly discriminated against.

■■■■ To succeed in its claim under 42 U.S.C. § 1981, plaintiff must prove it was intentionally discriminated against in the formation of a contract. *Simmons v. Chicago Public Library*, 860 F.Supp. 490, 492 (N.D.Ill.1994); *Pilditch v. Board of Education*, 3 F.3d 1113 (7th Cir.1993). To succeed in its claim under 42 U.S.C. § 1983, plaintiff must prove: (1) it held a constitutionally protected right; (2) it was deprived of this right in violation of the constitution; (3) defendant intentionally caused this deprivation; and (4) defendant acted under color of state law. *McNabola v. Chicago Transit Authority*, 10 F.3d 501, 513 (7th Cir.1993). The constitutionally protected right that plaintiff seeks to assert is the right of equal protection under the law. To establish an equal protection violation pursuant to § 1983 plaintiff must prove that it: (1) is a member of a protected class; (2) is otherwise similarly situated to members of the unprotected class; and (3) was treated differently from members of the unprotected class.

■■■■ A municipality may not be held liable under § 1981 or § 1983 based on a theory of respondeat superior. *Jett v. Dallas Indep. School Dist.*, 491 U.S. 701, 735–36, 109 S.Ct. 2702, 2723, 105 L.Ed.2d 598 (1989); *City of Canton v. Harris*, 489 U.S. 378, 385, 109 S.Ct. 1197, 1203, 103 L.Ed.2d 412 (1989).

---

**2.** The advertisement specified that the soap was to be supplied in drums only. Harris and Morgan met with Trader to inquire why the bid did not include bulk quantities, as had been the practice in the past. After further consideration, defendant issued an addendum to the bid to include bulk products.

A municipality can violate the civil rights of a person only by a discriminatory policy. *Baxter v. Vigo County School Corp.*, 26 F.3d 728, 734–35 (7th Cir.1994). The caselaw has identified three instances in which a municipality can violate a person's civil rights because of its policy: 1) an express policy, that, when followed, deprives a person of his or her constitutional rights; 2) a widespread practice that, though not authorized by an express policy or written law, "is so permanent and well-settled" as to constitute a "custom or usage" with the force of law; or 3) an allegation that the constitutional injury was caused by a person with "final policymaking authority." *Id.*

■ Under the undisputed facts, there is no evidence of a racially discrimination policy by defendant. Plaintiff's bid on the 1995 contract was initially rejected because it was deemed non-responsive. That decision was immediately reversed and the contract was awarded to plaintiff. Thus, even if Gambril and Hand acted with a discriminatory animus, it clearly was not pursuant to any unwritten policy and there was no injury to plaintiff. Defendant's 1996 request for bid clearly stated that Material Safety Data Sheets must be submitted with every bid. Plaintiff's 1996 bid and that of a non-minority contractor were therefore non-responsive because they did not include a Material Safety Data Sheet. This contract was awarded to another minority-owned company. Again, the undisputed evidence simply does not support an inference that defendant was acting pursuant to a racially motivated policy or practice.

■ Plaintiff argues that defendant's conduct constituted a pretextual justification for rejecting plaintiff's bids, and that defendant was acting in retaliation against plaintiff for "challenging the unwritten discriminatory business practices of the CTA." Specifically, plaintiff claims that after Harris and Morgan complained to Gronkowski about Gambril's decision on the 1995 paint/graffiti contract, Hand, Gambril and Trader "set in motion a policy and plan to deny Plaintiff future bids ..." Plaintiff alleges that majority-owned companies routinely submit bids without Material Safety Data Sheets to defendants and are awarded the contracts.

As noted, there is no evidence of a discriminatory policy in defendant's bidding process. Indeed, there is no evidence that any of defendant's actions in this matter were racially discriminatory. Most importantly, plaintiff has submitted no evidence to counter Trader's affidavits in which he states that he was totally unaware of plaintiff's 1995 contract situation when he rejected plaintiff's 1996 bid. Therefore, plaintiff has presented no evidence that Trader's actions were in any way retaliatory.

■ Moreover, even if plaintiff's purported Rule 12N statement had not been stricken, plaintiff still would not survive summary judgment. Viewing the record in the light most favorable to plaintiff, there is little, if any, evidence to support its claim. Plaintiff's only evidence of discriminatory intent by the defendant is the speculative testimony of its own agent, Harris.

First, plaintiff claims that this racial animus was "painfully obvious" during Harris's meeting with Gambril and Hand. Yet Harris did not testify to this in his description of the meeting in his deposition, as claimed in plaintiff's defective Rule 12N statement. Harris stated only that Gambril did not give him a reason as to why the contract was canceled. Harris also stated that he had an "inkling" that Hand's decision to reject the contract bid was racially discriminatory, but did not offer any specific reasons or any other evidence as to why he believed this to be the case.

■ Harris did testify that he has seen Hand treat minority vendors differently than white vendors, but again did not describe any particular instances of such treatment. Plaintiff has not submitted any affidavits or deposition testimony from any vendors to support his claim that Hand is racially biased. Moreover, even accepting the position that Hand's decision on the 1995 contract was racially motivated, as noted above, Hand's supervisor immediately reversed this decision and awarded the contract to plaintiff. Even if Gronkowski suspected that Gambril and Hand's decision was racially

based, he did not turn "turn a blind eye," but rather cured the problem immediately. Thus, there is no evidence that Hand was acting pursuant to any unwritten policy or custom.

Third, Harris did identify some other minority vendors that allegedly had a "litany" of problems with defendant, but again plaintiff offers no affidavits or deposition testimony from those vendors to support his claims. Plaintiff's only "evidence" is Harris's proffered testimony that other vendors had told him "they didn't think they got a good deal from [CTA]" or that they "thought they've gotten the short end of the stick from CTA." [3] Harris testifies that he has witnessed majority-owned companies receiving information that they requested from defendant immediately, while he would get "essentially the same kind of information" much later. Again, however, descriptions of specific instances are lacking and plaintiff offers no other evidence to support this statement.

Finally, plaintiff alleges that it suffered disparate treatment by defendant when its bid on the 1996 contract was rejected. Plaintiff claims that defendant's stated reason for rejecting the bid, the lack of a Material Safety Data Sheet, is pretextual. Again, as evidence to support this claim, plaintiff offers only Harris's testimony that majority companies are not subject to the same requirement.[4] Plaintiff submitted no affidavits from other vendors or any other evidentiary material in support of this claim.

■ Harris does testify that his own company had been awarded contracts in the past without submitting these forms. Accepting this as true, however, it does not create a genuine issue of material fact as to whether defendant intentionally discriminated against plaintiff in the formation of this contract or treated plaintiff differently than majority-owned vendors.

■ Harris also testified that when he confronted Trader (the procurement administrator in charge of the 1996 bid) about defendant's alleged policy of accepting bids without Material Safety Data Sheets, Trader referred to Harris and Morgan as "you people," which plaintiff claims was a "clear reference" to Harris and Morgan's race. But again, even if this were to be accepted as true, it would at most show that Trader displayed some racial animus toward Harris and Morgan. Plaintiff submitted absolutely no evidence that Trader spoke to Gambril, Hand or Gronkowski about the problems surrounding the 1995 contract or that Trader was even aware of the incident.

■ It is true that a single act or decision *of a final policymaker* can establish municipal policy. *Baxter*, 26 F.3d at 735 (emphasis added). However, plaintiffs does not allege that Trader has final policymaking authority. Indeed, Trader has the same job title as Hand, who clearly did not have final policymaking authority. This single incident, therefore, would not create a genuine issue of material fact as to whether the defendant had a discriminatory policy in place which resulted in the rejection of plaintiff's bid.

## II. *Count III*

■ In Count III of its complaint, plaintiff seeks damages for defendant's alleged breach of the 1996 soap supply contract. To succeed in a cause of action for breach of contract, plaintiff must show: (1) a contract existed; (2) plaintiff performed its obligations; (3) defendant breached its obligations; and (4) plaintiff suffered damages. *Talbert v. Home Savings of America, F.A.,* 265 Ill.App.3d 376, 202 Ill.Dec. 708, 638 N.E.2d 354, 357 (1994). To prove that a valid contract existed, plaintiff must show that there was an offer, an acceptance, and consideration. *Id.*

■ The submission of a bid on a municipal contract is an offer only and no contract

---

3. This is hearsay that would be inadmissible at trial.

4. In its Response to Defendant's Motion for Summary Judgment, plaintiff claims that Harris names two majority owned companies in his deposition that were awarded contracts without submitting MSDS sheets. However, in the portion of the deposition cited by plaintiff, Harris actually names two *minority* owned companies, plaintiff and Resource International. *See* Harris Dep., pg. 69.

is created until a written contract is executed by the public body. *Hassett Storage Warehouse, Inc. v. Bd. of Election Com'rs for the City of Chicago,* 69 Ill.App.3d 972, 25 Ill.Dec. 909, 387 N.E.2d 785, 793 (1979). When a public body, though not required to do so by statute, has called for bids, the public body may award the contract to any bidder it considers responsible. *Id.*

It is uncontested that defendant's procurement specifications and contract documents for the 1996 bus wash soap contract provide that "[a]ll Material Safety Data Sheets must be submitted with the bid, shall be completed in full and all hazardous ingredients and first aid instruction be listed." *See* Detail Specification 2.3.5. The contract documents also state it shall make a contract award to the lowest responsive and responsible bidder. *See* Special Conditions, p. 2.[5] Plaintiff's do not argue that its bid was responsive, they merely argue that defendant had awarded contracts in the past regardless of this requirement.

Plaintiff has submitted no evidence that the 1996 contract was ever formed between the parties. Nor does it offer any law in support of its contention that a bidder's submission of the lowest bid automatically signifies acceptance on the part of the other party. Indeed, plaintiff does not even refer to this count in either its purported 12N statement or its response to defendant's motion to summary judgment.

### CONCLUSION

For the reasons set forth above, defendant's motion for summary judgment is granted.

---

**5.** These facts are uncontested whether or not the plaintiff's purported 12N statement is considered.